Filed 8/31/20; Certified for Publication 9/17/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>RODRIGO DECASAS,<br><br>     Defendant and Respondent. | B301297<br><br>(Los Angeles County<br>Super. Ct. No. ZM010896) |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Jackie Lacey, District Attorney, Phyllis C. Asayama and Matthew Brown, Deputy District Attorneys for Plaintiff and Appellant.

Robert S. Gerstein, under appointment by the Court of Appeal, for Defendant and Respondent.

_____

Thirteen years after the People filed a petition to have Rodrigo DeCasas civilly committed under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code,[1] § 6600 et seq.), the trial court granted DeCasas's motion to dismiss the petition on the ground that he had been deprived of his due process right to a speedy trial.  The People appealed.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Background*

In 1994, DeCasas pleaded guilty to one count of a forcible lewd act with a child under 14 years (Pen. Code, § 288, subd. (b)), three counts of lewd acts with children under 14 years (Pen. Code, § 288, subd. (a)), and one count of continuous sexual abuse of a child under 14 years (Pen. Code, § 288.5).  The court sentenced him to 20 years in prison.

On November 2, 2006, the Los Angeles County District Attorney filed a petition under the SVPA to have DeCasas committed as a sexually violent predator (SVP).[2]  The petition

---

[1] Unless otherwise specified, subsequent statutory references are to the Welfare and Institutions Code.

[2] At the time the original petition was filed against DeCasas, a sexually violent predator was defined as "a person who has been convicted of a [statutorily defined] sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."  (Former § 6600, subd. (a)(1).)  By the time the People filed an amended petition in September 2007, the electorate had expanded the definition to require a conviction of a sexually violent offense against only *one*

was supported by evaluations from Thomas MacSpeiden, Ph.D., and Bruce Yanofsky, Ph.D., who diagnosed DeCasas with pedophilia and schizophrenia, primarily because of his qualifying offenses, which predisposed him to commit sexually violent predatory offenses.

The court appointed the Los Angeles County Public Defender to represent DeCasas. Deputy Public Defender Craig Osaki represented DeCasas at an initial review hearing held on November 16, 2006 with DeCasas present in court. Osaki waived DeCasas's right to a probable cause hearing and the court ordered DeCasas to "remain in custody in a secure facility" pending trial. DeCasas waived his right to be present at subsequent hearings pending trial.

During Osaki's tenure as DeCasas's counsel, the court held pretrial conferences in January, April, July, and September 2007.[3] Osaki was present at each and, according to minute orders, DeCasas's presence was waived. At each hearing, the court continued the conference pursuant to the stipulation of counsel.

In late 2007, Deputy Public Defender David Santiago began representing DeCasas. According to Santiago, "not a lot had been done" on the case prior to the assignment to him.

---

or more victims and added violations of Penal Code section 269 to the definition of sexually violent offenses. (Stats. 2006, § 24, pp. A-320 to A-321 [Proposition 83].)

[3] At the September 6, 2007 conference, the People filed an amended petition adding an additional underlying charge, which DeCasas's counsel referred to as a clerical correction.

Santiago first appeared for DeCasas at a pretrial conference on December 11, 2007.[4]  The court continued the conference to April 8, 2008.  On that date, the court continued the conference to June 26 pursuant to the stipulation of counsel.

At the June 26, 2007 conference, Santiago stated that he had cases that were older than DeCasas's case and he did not "anticipate being ready to go to trial on this matter in 2008," but "hope[d] to proceed on it sometime [in 2009]."  The conference was continued to October 28, 2007, and on that date, to February 23, 2009.  At the February conference, the prosecutor told the court that "[w]e're early in the hunt on this case" and "things [are] moving along."  Pursuant to counsel's stipulation, the court continued the conference to July 27, 2009.

On July 27, 2009, Santiago told the court that he had not been in contact with DeCasas because DeCasas had been returned to prison for parole violations.  Santiago anticipated DeCasas would be released in January 2010.  The court continued the case to February 19, 2010.  The court asked Santiago to bring to the conference a "waiver of time" from DeCasas.  Santiago said that doing so would "be difficult."

Santiago directed his paralegals to meet with DeCasas to have him sign waivers of his right to appear and to a speedy trial, but DeCasas never signed one.  Santiago did not know whether anyone had advised DeCasas of his speedy trial rights and our record does not disclose why DeCasas did not sign a waiver.

---

[4] A reporter's transcript states that Santiago appeared for DeCasas at the December 11, 2007 pretrial conference.  A minute order for the same conference states that Osaki appeared for DeCasas.

At the next conference, in February 19, 2010, the court asked Santiago if he had obtained "a declaration of time waiver [and] nonappearance" from DeCasas. Santiago said, "[A]ny sort of waivers information that I had for [DeCasas] have expired." He explained that he has had "difficulties in communicating with [DeCasas] and is "just trying to reinstitute contact with [him]." The court continued the hearing to April 29, 2010 and told Santiago to "get the declaration then." Santiago said he will "make attempts to do so." At the April 29 conference, Santiago explained that he was still having "difficulty getting [DeCasas] to cooperate" and he was "still working on" getting a time and appearance waiver.

### B. *The* Ronje *decision and the probable cause hearing*

In November 2009, the Fourth District of the Court of Appeal decided *In re Ronje* (2009) 179 Cal.App.4th 509 (*Ronje*), disapproved in *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 655. *Ronje* held that a particular standardized assessment protocol used by SVP evaluators prior to 2008 was invalid and its use "constitute[d] an error or irregularity in the SVPA proceedings." (*Ronje, supra*, 179 Cal.App.4th at p. 517.) The court held that "the proper remedy" is for the trial court "to (1) order new evaluations of [the alleged SVP] using a valid assessment protocol, and (2) conduct another probable cause hearing . . . based on those new evaluations." (*Id.* at p. 519.)

After *Ronje*, the SVP unit of the Los Angeles County Public Defender's Office "filed a significant number" of "*Ronje* motions," which resulted in a backlog of probable cause hearings in the superior court resulting in delays of one or two years.

On August 17, 2010, Santiago filed a *Ronje* motion on behalf of DeCasas requesting a probable cause hearing based on new evaluations. The prosecution stipulated to the relief and the court promptly granted the motion. The court's order required the state's evaluators to conduct further interviews of DeCasas and prepare new evaluations.

At a hearing held in October 2010, the prosecutor had only one of the state's two required evaluations ready. The court asked Santiago if DeCasas was willing to waive time, and Santiago answered, "Yes." When Santiago was asked about this answer at the hearing on the motion to dismiss, Santiago testified that he "was waiving time on [DeCasas's] behalf . . . [without] his permission."

By December 15, 2010, Santiago had received the second of the state's evaluations. During a hearing held on that date, the court asked Santiago if DeCasas was willing to waive time, and Santiago answered, "Yes." Santiago informed the court that there were mathematical errors in the evaluations and that he would need to consult with the defense expert. The court continued the hearing at Santiago's request to March 17, 2011. On that date, Santiago informed the court that he was "doing further work on the case." He requested, and the court granted, a continuance to June 16, 2011.

At a hearing on June 16, 2011, Santiago waived DeCasas's appearance and stated that DeCasas "does want to be present by video for another setting." The court then continued the hearing to September 12, 2011.

On September 12, 2011, DeCasas appeared by video. After setting the post-*Ronje* probable cause hearing for dates in June 2012, court and counsel agreed on December 7, 2011 for a status

6

conference.  The court asked DeCasas if he would like to be present by video on that date.  DeCasas said he would.  No one asked DeCasas whether he was asserting or willing to waive his due process right to a speedy trial.

At the December 7, 2011 status conference, Santiago informed the court that DeCasas was not present and "refused to appear on video."

In May 2012, Santiago filed a motion to continue the probable cause hearing on the ground that there was uncertainty as to whether the state's evaluators would "be on the panel after June 30, 2012," and, if they were to be replaced, Santiago "would lose his ability to cross-examine any subsequent evaluators."  The prosecutor did not oppose the continuance.

During the May 15, 2012[5] hearing on the motion to continue the probable cause hearing, the court inquired about DeCasas "waiving his rights to have his probable cause hearing next month."  The court told Santiago that it could hold a video conference with DeCasas within the next few days to get his waiver, allow Santiago to obtain a written waiver, or allow Santiago to waive time on DeCasas's behalf if Santiago had the authority to do so.  Santiago responded:  "I don't believe I do.  My paralegal did speak to him last week, filled him in on what the situation was and felt he was amenable[.]  [A]lthough he . . . is not happy with delays, . . . he does understand the reason why. So[,] on that basis, I believe that I do have the authority."  The court set a date six days thence for a video conference.

---

[5] The transcript of this proceeding states that the date is May 15, 2011.  The year appears to be a typographical error.

At the subsequent hearing on May 21, 2012, DeCasas did not appear, by video or otherwise, and Santiago announced that DeCasas had "waived his presence." The minute order for the proceeding states that Santiago "inform[ed] the [c]ourt that has [*sic*] not requested to have a speedy trial." The court then vacated the June 2012 probable cause hearing dates "per stipulation" of counsel, and set the hearing for dates in August 2013.

At a status conference on August 13, 2012, Santiago said that he was waiving DeCasas's appearance and that DeCasas "decided not to appear via video." Further conferences were held on May 23, and August 1, 2013, which, for purposes of this appeal, were without substance.

On July 31, 2013, Santiago received updated reports from the state's evaluators.

The court held the probable cause hearing during two days in August 2013. DeCasas was present via video on each day. After testimony from the state's two evaluators and argument from counsel, the court found that there was probable cause to believe that DeCasas is likely to engage in sexually violent predatory criminal behavior upon his release. The court ordered DeCasas to remain in custody in a secure facility pending trial.

At some point after the probable cause hearing, Santiago met with DeCasas in person for the first time. According to Santiago, DeCasas presented with a "flat affect" and appeared to be heavily medicated. Their meetings were short because DeCasas was "very non-communicative" and "fairly nonresponsive." The meetings were thus "not all that productive" or beneficial to preparing his defense.

8

On October 17, 2013, the court held a pretrial conference and DeCasas appeared via video. Santiago said that he is "in the process of obtaining an expert" and "in discussions with one at this time." The court continued the conference to December 6, 2013. DeCasas was asked if he would like to be present via video on that date. He said his "lawyer may" appear for him.

At a pretrial conference on December 6, 2013, Santiago said his "possible expert [was] still mulling over the materials" he had given her and he hoped to hear from her within the next couple of weeks to see whether she will accept the case. The court continued the matter to January 14, 2014.

At the January 14, 2014 conference, Santiago said that his prospective expert informed him "a few days ago" that "they would no longer like to work in Los Angeles County because their fees kept getting cut." The court reminded Santiago that "this is a 2006 case" and "[w]e need to get this matter moving toward trial." Santiago responded that he would "need a few more weeks" to find an expert. The prosecutor stated that he is "ready to go to trial." The court continued the conference to February 11, 2014.

At the February 11, 2014 conference, Santiago submitted a request for the appointment of Brian Abbott, Ph.D., an expert, which the court approved. Santiago requested that the status conference be continued to late April "to see how close I am to being ready" for trial. The court continued the conference to May 2, 2014.

At the May 2, 2014 conference, Santiago informed the court that his expert would meet with DeCasas in June. He requested a further status conference in July and said that "DeCasas would

9

like to appear." The court continued the conference to July 23, 2014.

During the July 23, 2014 conference, Santiago stated that DeCasas had been scheduled to appear by video, but "has decided [he] does not want to participate." Santiago further stated that he was researching an issue that "could possibly be dispositive." The court set October 6, 2014 for a pretrial conference and a hearing on Santiago's unspecified motion. At that time, Santiago said he was waiting for a "defense report," and requested to "trail this matter" to November 24, 2014. With the prosecutor's acquiescence, the court granted the request.

## C.    *2014 SVP Unit Staffing Cuts*

In late 2013, the chief deputy public defender and the assistant public defender asked Michael Suzuki—then the head deputy of the Long Beach branch—for Suzuki's assessment as to whether the SVP unit could absorb a decrease in staffing to allow for the transfer of lawyers to other divisions. At that time, the SVP unit had 20 attorneys and 20 paralegals. Suzuki reviewed statistics showing a decrease in new SVP cases and the unit's progress in resolving older cases. He was also aware that the state had decided to discontinue its funding of SVP litigation and that other "divisions of the [public defender's] office were significantly understaffed and . . . were looking for felony lawyers." Suzuki concluded that the unit could absorb a decrease in staffing.

In 2014, the public defender's office undertook two rounds of SVP unit staffing cuts, which together reduced the number of lawyers in the SVP unit by about 50 percent; from approximately 20 attorneys to approximately 10. The number of paralegals was also reduced. After the reduction in staff, attorneys had an

average caseload of 12 cases. According to Suzuki, the public defender's office conducted a post-reduction assessment of the workloads and concluded they were "reasonable."

Osaki, who was the deputy-in-charge of the SVP unit in 2014, expressed his concerns about the staff reduction in two memos to senior management within the public defender's office. In a memo sent in April 2014, Osaki stated that the then-proposed cuts and resulting increase in workloads would cause the remaining attorneys to be "less efficient in handling their cases" and "the competency of their practice may be challenged. In other words, no lawyer can be competent with such an added workload in such a short period of time." Osaki proposed a gradual reduction in staff that would correspond to reductions in SVP cases.

Osaki sent his second memo in August 2014, after the first round of cuts and before a proposed second round. He stated that "[t]he attorney staff has been significantly impacted as a result of the staff reductions" and that "each attorney has had difficulty with their increased workload." "As a result of the increases in their workload," Osaki continued, "the staff has expressed concerns over their ability to effectively and competently represent their clients on what are ostensibly life cases." The cuts, he concluded, "has placed the SVP [b]ranch in an untenable situation of being ineffective. Any further cuts could lead to legal liabilities." Osaki later testified that he used this language to implicate their clients' federal constitutional rights to the effective assistance of counsel.

Other attorneys within the SVP unit wrote an anonymous memo to the public defender on April 24, 2014. The then-prospective 50 percent reduction of staff, the attorneys

stated, would "be devastating to [their] ability to effectively represent [their] clients" and "result in the ineffective and incompetent representation of [their] clients." Santiago testified that he was among the attorneys who drafted this memo.

In September 2014, SVP unit attorneys wrote anonymously to the members of the Los Angeles County Board of Supervisors and the State Bar of California. Santiago was involved in the drafting of these letters. To the Board of Supervisors, the attorneys stated that the staffing cuts will result in their abandonment of some clients, who would then "have a viable lawsuit against the county." The letter to the State Bar accused the public defender and the assistant public defender of "jeopardizing the representation of [their] clients . . . and placing the lawyers in the untenable position of either [violating their clients' rights to effective assistance of counsel] or effectively abandoning their clients." As a result of the staffing cuts, the "remaining lawyers do not have adequate resources to properly handle the cases" and must either abandon "the client or risk being ineffective." The lawyers further asserted that the public defender and "the chief deputy" "have failed to properly discharge their responsibilities and in turn they have placed the lawyers in their charge at risk for claims of ineffective assistance of counsel." The lawyers accused the public defender of "repeatedly violat[ing] [r]ule 3-110(A) of the Rules of Professional Conduct by failing to ensure that the lawyers have appropriate resources so that they are able to competently represent their clients."[6]

---

[6] Former rule 3-110(A) of the Rules of Professional Conduct provided: "A member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence."

In June 2015, attorneys again wrote to the Board of Supervisors, stating that "the conditions at the public defender's office continue to deteriorate under the chaotic management of [the public defender and chief deputy]," and that their "improvident management style . . . continues to expose the county to liability."

Santiago testified that the fact that public defenders were delaying their cases as a result of the staffing cuts was not a "secret. It was very, very open and it was said in open court repeatedly by many, many public defenders." Personally, he was assigned "five or six new cases" as a result of the staffing cuts, and became "overwhelmed." Cases "kept popping up," he testified, and his "work schedule did not allow for [him] to get [DeCasas's] trial in motion."

At a conference held in DeCasas's case on November 24, 2014, Santiago stated: "[M]y caseload has had a significant change since the last time we appeared in court. I'm trying to make d[o] with what I can, trying to triage what I can do based on my office's lack of resources." Santiago further reported that he was still waiting for a defense report. The court continued the conference to January 21, 2015.

At the January 21, 2015 hearing, Santiago informed the court that he could be ready for trial in late summer or early fall 2015. The court continued the conference to April 17, 2015. At that time, the prosecutor said that he will get updated reports. At the next conference on June 15, Santiago stated that he is awaiting the prosecutor's updated reports.

At an August 24, 2015 conference, Santiago stated that he was still awaiting updated reports from the People and, when he receives them, he will "respond accordingly." The prosecutor

13

apologized for not having the updated reports and said he could get them within 60 days. The court continued the conference to December 7, 2015. At the December 7, 2015 conference, the prosecution had still not obtained the updated reports.

At the next conference on March 2, 2016, Deputy District Attorney Stacie Gravely appeared for the first time on behalf of the People. Santiago reported that he had just received the updated reports.

On June 28, 2016, Santiago reported that he was in the process of scheduling depositions of the People's experts and waiting for his expert's report. On October 6, 2016, Santiago told the court that he is awaiting his expert's report and that "this is a case that could and should be tried in 2017." The conference was continued to January 24, 2017, and, on that date, continued to April 27, 2017.

In late 2016, Santiago was assigned to represent George Vasquez in another SVPA proceeding which was set for trial in January 2017. During his only court appearance in that proceeding, Santiago informed the court that he could not be prepared in time for the trial. Santiago also informed his "head deputy" in an email that he was concerned about his ability to competently represent Vasquez and that the case was affecting his ability to assist DeCasas. The head deputy then relieved him of work on the Vasquez case, but immediately assigned to him another, "very complex" SVPA case.

Santiago left the SVP unit in early 2017. Deputy Public Defender Christina Behle took over DeCasas's case in March 2017. Behle was new to the SVP unit at that time and had received no training in SVP litigation.

In transferring the case to Behle, Santiago informed her that DeCasas's "refusal to speak with [him] made it difficult to do anything with his case for several years," which led Santiago "to prioritize other cases with other legal issues to litigate." He further informed Behle that in 2014 he had started to research "issues concerning clients with immigration holds," but he "had to temporarily shelve the motion" when the 2014 staffing cuts occurred and his "caseload doubled."[7] He was "overworked," he said, "carrying 14 cases at one point."

According to Behle, Santiago had not given her any indication that DeCasas "wanted his trial immediately." In her review of the file, however, she found "[p]aralegal notes" indicating that, "[f]rom 2010 on," DeCasas had told the paralegal, " 'I want out of here. I want to go home.' "

Behle testified that she met with DeCasas once during the year she represented him and saw him by video several times. DeCasas had complained to her that his prior attorneys had not done work on his case while it dragged on for years.

On April 17, 2017, Behle appeared on behalf of DeCasas and requested a continuance, which the court granted, to June 22, 2017. On June 22, 2017, DeCasas appeared via video, but, so far as our record shows, did not speak. The conference was continued to September 19, 2017.

DeCasas appeared by video on September 19, 2017. The prosecutor stated that she would need to order updated reports to prepare for trial. The conference was continued to December 5, 2017. The court told DeCasas: "Take care,

---

[7] Behle researched the "immigration issue" that Santiago had been considering and determined that it did not support "a viable motion."

Mr. DeCasas. Your attorneys are working hard to get everything ready." The record does not reflect that DeCasas made any response.

DeCasas appeared by video at the December 5, 2017 conference. Behle requested the conference be continued to February 6, 2018, which the court granted. DeCasas was silent.

### D. *The Vasquez Ruling and DeCasas's Motion to Dismiss*

On January 8, 2018, the Los Angeles Superior Court issued an order in the SVPA case against George Vasquez (*People v. Vasquez* (Super. Ct. L.A. County, 2018, No. ZM004075)) granting a motion to dismiss that proceeding based on the denial of the respondent's due process right to a speedy trial. According to Behle, as a result of that ruling, SVP unit attorneys reviewed their files and prepared "a chronology of what happened."

In the instant case, the court held a pretrial conference on February 6, 2018. Behle said she could be ready for trial at the end of May 2018. The court set the trial date for May 1, 2018, over the prosecutor's objection that she could not be ready on that date. The court informed counsel that they are "going to be pushed to try cases," and if counsel desired a continuance they would need to file a written motion.

In late February 2018, the supervising judge of the superior court's criminal division ordered the reassignment of "all 101 SVP post-probable cause and pre-trial cases to a single judge for all purposes."

At a pretrial conference on March 19, 2018, Deputy District Attorney Michael Derose announced that he had just taken over the case. Behle informed the court that the public defender's office will probably have to declare a conflict. DeCasas, who was

16

appearing by video, said, "I'm not understanding." The court explained to him: "Your lawyer may have a conflict that would prevent her from representing you. If that's the case, . . . I will have to appoint a new lawyer for you, in which case your trial will not go forward [on] May 1st."

DeCasas responded, "So then when?"

The court stated, "I don't know yet because the new lawyer will need time to prepare. From your body language, I get the impression you are not happy about this."

DeCasas told the court that he "was told by the paralegal in May this was going to take place." The court explained that "circumstances have changed," and it is not unusual for a lawyer to declare a conflict that prevents the lawyer from representing the client. The court "will appoint a new lawyer [who] will have to consult with your old lawyer, look at where the case is now, and then they will be able to tell [the court] when they can go forward with the trial."

DeCasas asked, "It is no longer going to be this attorney?" The court responded, "Correct."

The court then vacated the May 1 trial date and set a further conference for April 2.

The court told DeCasas: "You will come back and see me on April 2nd. That is about two weeks from now. Hopefully we will know who your new lawyer is then." DeCasas responded, "Okay."

On April 2, 2018, DeCasas declined to appear by video. The court relieved the public defender and appointed Mary Masi, bar panel counsel, to represent DeCasas. At the next conference, on May 7, Masi informed the court that she intended to file a motion

to dismiss, noting that DeCasas's situation is procedurally similar to the respondent in *Vasquez*.

On September 12, 2018, Division Seven of this court issued its opinion in *People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36 (*Vasquez*), upholding the trial court's dismissal of the SVPA proceeding against Vasquez based on a violation of his due process right to a speedy trial. The 17-year delay in bringing the case to trial, the Court of Appeal explained, was caused in part by a "systemic breakdown in the public defender system" (*id.* at p. 74), which resulted from "dramatic staffing cuts in the office" of the Los Angeles County Public Defender (*id.* at p. 72). The court also faulted the trial court for failing to take "meaningful action to set deadlines or otherwise control the proceedings and protect Vasquez's right to a timely trial." (*Id.* at p. 75.)

On April 17, 2019, Masi filed a motion to dismiss the petition based on *Vasquez*. An evidentiary hearing on the motion was heard on May 28 and 29, 2019. In addition to voluminous evidence concerning the history of the case, summarized above, and testimony at the hearing, the motion was supported by the declaration of two court-appointed psychologists who opined that DeCasas did not have a diagnosed mental disorder within the meaning of the SVPA. One of the psychologists also stated that DeCasas "was most likely not competent to comprehend issues of speedy trial through counsel, or to assist or meaningfully authorize counsel to handle legal proceedings on his behalf." The psychologist qualified this opinion, however, by stating that "DeCasas was most likely to have been intermittently competent over the years. When he appeared on video before the court, he may well have been competent if there was an inquiry of him

by the [c]ourt of counsel regarding whether he understood the proceedings at that time."

### E.    *The Trial Court's Ruling*

On August 19, 2019, the court granted DeCasas's motion to dismiss.  The trial court found that the length of the delay between DeCasas's arraignment in 2006 and the [motion to dismiss]—13 years—was "presumptively prejudicial" and "caused an oppressive period of pretrial confinement."  Although the court found that DeCasas had not asserted his right to a speedy trial, he had been "forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial without prepared counsel or giving up his right to a speedy trial."  The court therefore did not "give significant weight to [DeCasas's] failure to assert his right to a speedy trial.)

The "pivotal question" for the court was "who caused the delay."  Based on Santiago's actions and DeCasas lack of cooperation with his counsel, the court attributed the delays occurring "during the first eight years" of the case—from 2006 to 2014—to DeCasas.  Based on the 50 percent reduction in SVP staff in 2014 staffing cuts, which occurred "[d]espite the pleas from the SVP attorneys on the ground and from at least one middle management member," the court concluded that the "[e]vidence supports the conclusion that a systemic breakdown within [the public defender's] office caused Mr. Santiago's inability to bring [DeCasas's] case to trial."  That "systemic breakdown," the court concluded, "caused the delay from 2014 forward."

The court also attributed the delay in part to the courts, and thus to the state, based on:  (1) the court's failure to consider whether good cause existed for the numerous requests for

19

continuances between 2006 and 2018; (2) the court's failure to inquire of DeCasas during his video appearances whether "he wished to waive his right to a speedy trial"; (3) the court's failure to address the SVP unit's staffing problems, which "was a well-known fact in the courthouse"; (4) the failure to consider removing the public defender's office until 2018; and (5) failing to allocate court resources for probable cause hearings after *Ronje*.

The court attributed "a small portion of the responsibility for the delay" to the prosecution based on the prosecutor's delay in obtaining updated evaluations in 2015 and 2016.

The court noted that, if not for the *Vasquez* decision, it would have ordered the matter to trial. Because it is bound by *Vasquez*, however, the court concluded that "the proper remedy is the dismissal of the [p]etition."

The People timely appealed.

## DISCUSSION

### A. *Standards of Review*

We review a trial court's ruling granting a motion to dismiss for prejudicial pretrial delay for abuse of discretion. (*Vasquez, supra*, 27 Cal.App.5th at p. 55; *U.S. v. Sears, Roebuck and Co., Inc.* (9th Cir. 1989) 877 F.2d 734, 739.) Under this standard, we review the trial court's findings of fact for substantial evidence and its conclusions of law de novo. (*People v. Jones* (2013) 57 Cal.4th 899, 922; *Vasquez, supra*, 27 Cal.App.5th at p. 55.)

### B. *The Due Process Right to a Speedy Trial in SVPA Cases*

Under the SVPA, "the state can civilly commit individuals found to be SVPs after they conclude their prison terms." (*Reilly,*

*supra,* 57 Cal.4th at p. 646.)  A petition for an SVPA commitment must be supported by evaluations by two mental health experts appointed by the director of the California Department of State Hospitals.  (§ 6601, subd. (d); *Reilly*, *supra*, 57 Cal.4th at p. 647.)  After the filing of a SVPA petition, the court must hold a hearing to "determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).)  If the court finds such probable cause, the alleged SVP is entitled to a trial by jury and the assistance of counsel.  (§ 6603, subd. (a).)  At trial, the People must prove that the individual is an SVP beyond a reasonable doubt.  (§ 6604.)

To establish that one is an SVP, the People must show, among other elements, that the person has "a currently diagnosed mental disorder."  (§ 6600, subd. (a)(3).)  Because of this requirement, the People are entitled to obtain updated evaluations of the alleged SVP when existing evaluations have become "stale."  (*People v. Landau* (2013) 214 Cal.App.4th 1, 25 (*Landau*); see *Albertson v. Superior Court* (2001) 25 Cal.4th 796, 802–803.)  The alleged SVP is entitled to retain experts (§ 6603, subd. (a)) who may independently evaluate the alleged SVP and respond to the People's evaluations.

After the determination of probable cause and prior to the completion of the trial, the alleged SVP shall "remain in custody in a secure facility."  (§ 6602, subd. (a).)

The SVPA does not specify a time within which a trial must be held after the court makes a probable cause finding.  (*Vasquez, supra*, 27 Cal.App.5th at p. 57)  The constitutional requirement of due process, however, applies to SVPA commitment proceedings and requires "a trial within a ' "meaningful time." ' " (*Landau,*

*supra,* 214 Cal.App.4th at p. 31.)  Courts have analyzed an alleged deprivation of due process arising from delays in SVPA proceedings in two ways:  (1) under the framework establish in *Barker v. Wingo* (1972) 407 U.S. 514, 530 (*Barker*) for assessing a criminal defendant's Sixth Amendment right to a speedy trial; and (2) under the framework established in *Mathews v. Eldridge* (1976) 424 U.S. 319, 334–335 (*Mathews*) for assessing denials of the constitutional right to due process.  (See, e.g., *Vasquez, supra*, 27 Cal.App.5th at pp. 60–82; *People v. Litmon* (2008) 162 Cal.App.4th 383, 399–406 (*Litmon*); *Landau, supra*, 214 Cal.App.4th at pp. 33–44.)

Under *Barker*, a criminal defendant's claim that his or her speedy trial right has been violated is analyzed by weighing four factors:  "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Barker, supra*, 407 U.S. at p. 530; accord, *People v. Williams* (2013) 58 Cal.4th 197, 234 (*Williams*).)  These factors are "related . . . and must be considered together with such other circumstances as may be relevant." (*Barker, supra*, 407 U.S. at p. 533.)

Under *Mathews*, an analysis of "due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews, supra*, 424 U.S. at p. 335.)

Because of its factually similarity, the *Vasquez* decision is instructive. In that case, the People filed a petition in September 2000 to commit Vasquez as an SVP and the court appointed the Los Angeles County Public Defender's Office to represent him. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 44.) From the time of the first probable cause hearing in February 2002 until May 2007, " 'it appears that little progress, if any, was made towards moving the case to trial.' " (*Id.* at p. 45.) In May 2007, a second deputy public defender began representing Vasquez. (*Id.* at p. 46.) After numerous continuances, the court set a trial date for March 2010. (*Ibid.*) Before trial took place, *Ronje* was decided and the court set a new probable cause hearing. (*Id.* at p. 47.) It is not clear from the *Vasquez* opinion when the probable cause hearing occurred, although it appears to have taken place prior to May 20, 2014.

A third deputy public defender, Terry Shenkman, began representing Vasquez in 2012. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 47.) At a hearing in June 2013, the court informed Vasquez that he has " 'a right to have a speedy probable cause hearing, and we're putting this matter over for many, many months into April of 2014 at your attorney's request. Is that what you would like to do, sir?' Vasquez responded, 'That would be fine.' " (*Id.* at p. 48.)

In October 2014, Shenkman explained her failure to confer with a defense expert by stating, " '[A]s the court knows, my department staff has been reduced by 50 [percent] and the workload has increased, and I have explained that to . . . Vasquez, who understands.' " (*Vasquez*, *supra*, 27 Cal.App.5th at p. 48.) At a hearing in December 2014, where the court raised the status of the trial preparation, Shenkman stated, " '[M]y

office suffered a staff reduction of 50 percent of the lawyers. Then we suffered an additional reduction in the paralegals. And I have currently lost my paralegal and don't have a paralegal assigned on the case.  [¶]  So in addition to having my workload greatly increased, I also have cases in which I don't have assistance on, and I am currently engaged in two probable cause hearings, and I have a restoration of sanity hearing that's supposed to begin. . . . I have explained my situation to . . . Vasquez, and . . . Vasquez advised me he understood and he wants me to be prepared, and he is willing to give me whatever time that I need in order to prepare for his trial.' " (*Id.* at pp. 48-49.)  At a subsequent hearing on a defense motion to continue the trial date, Shenkman again referred to the effect of her caseload on her ability to prepare for trial, stating, " 'I know I will not be prepared by April 27th due to the amount of work that needs to be done, not only on this case but on other cases.  And it's not as if I can drop work on all my other cases in order to focus on this.' " (*Id.* at p. 49.)  Shenkman made similar comments to the court at subsequent conferences held in 2015 and 2016.  (*Id.* at pp. 49–50.)  At some point, the court set the trial for January 23, 2017.  (*Id.* at p. 50.)

In October 2016, the public defender's office transferred Shenkman to another branch.  (*Vasquez, supra*, 27 Cal.App.5th at p. 53.)  Shenkman later testified that she was "eager to go to trial" and would have been ready on January 23, 2017.  (*Ibid.*)

At a hearing in November 2016, David Santiago—Vasquez's fourth attorney—appeared on Vasquez's behalf and informed the court that " 'it appears' " that he will represent Vasquez going forward.  (*Vasquez, supra*, 27 Cal.App.5th at p. 50.)  Santiago informed that court that he could not be ready

for trial on the date the trial was then set, in January 2017. (*Ibid.*)  When the court asked Vasquez if he was willing to postpone the trial so that his counsel can be prepared, Vasquez stated, " 'Your Honor, I am not willing to waive my right to have a trial in a timely manner, nor am I willing to waive my right to have prepared counsel.  These constant changes of counsels have denied me both.  Enough is enough.' "  (*Ibid.*)

At a hearing in December 2016, a fifth deputy public defender appeared for Vasquez and informed the court that she was not prepared to go to trial in January 2017.  (*Vasquez, supra*, 27 Cal.App.5th at p. 51.)  After Vasquez complained that he did not want the new attorney representing him, the court ultimately relieved the public defender as Vasquez's counsel and appointed counsel from the bar panel.  (*Ibid.*)  Eight months later, the newly appointed counsel filed a motion to dismiss based on the denial of Vasquez's due process right to a speedy trial.  (*Id.* at p. 52.)  By then, it had been 17 years since the SVPA petition was filed.

The trial court granted the motion to dismiss and the People filed a petition for writ of mandate in this court. (*Vasquez, supra*, 27 Cal.App.5th at p. 54.)  The Court of Appeal applied the speedy trial factors under *Barker* and the due process analysis under *Mathews*.  Under the *Barker* analysis, the court explained that "the cause of the delay is the pivotal question for our due process inquiry."  (*Vasquez, supra*, 27 Cal.App.5th at p. 64.)  The prosecution, the court concluded, had no responsibility for the delay.  (*Ibid.*) Although delays caused by defense counsel are ordinarily attributable to the defendant, the court explained that during the period from October 2014 through December 2016, when "Shenkman was hampered in her preparation for trial by the dramatic staffing

25

cuts in the office" (*id.* at p. 72), there had been a "systemic breakdown in the public defender system that caused the final two- to three-year delay in bringing Vasquez's matter to trial" (*id.* at p. 74). The court agreed with the trial court that, based on " '[t]he dysfunctional manner in which the [p]ublic [d]efender's [o]ffice handled . . . Vasquez's case,' " the delay after October 2014 was attributable to the state. (*Id.* at p. 73.)

The *Vasquez* court also held that "the trial court must share responsibility for some of the delay" and, to that extent, the delay is "attributable to the state." (*Vasquez*, *supra*, 27 Cal.App.5th at p. 74.) For the first 14 years of the case, the Court of Appeal observed, the trial court allowed hearings and conferences to be continued over 50 times without indicating whether the continuances were for good cause and failed to take "meaningful action to set deadlines or otherwise control the proceedings and protect Vasquez's right to a timely trial." (*Id.* at p. 75.) The court was "particularly troubled" by the delay that occurred after Shenkman first reported on the effect of the 2014 staffing cuts on her workload. (*Ibid.*) "[B]y early 2015 it became clear the case was proceeding slowly because of dramatic staffing cuts in the public defender's office. While we have found this breakdown in the public defender system is attributed to the state, the trial court failed Vasquez as well. We recognize the challenge facing a well-intentioned trial court in seeking to move an SVPA petition to trial while protecting the individual's right to competent counsel. However, the trial court should have considered whether to remove the public defender's office so that an attorney with adequate time to prepare the case could assume Vasquez's representation. Indeed, the trial court ultimately took this action, but not until almost two years had passed, when

Vasquez spoke up and declared, 'Enough is enough.' " (*Id.* at p. 77.)

The *Vasquez* court also held that Vasquez's due process rights were violated under the *Mathews* analysis. Vasquez's "confinement for 17 years awaiting trial caused a significant deprivation of liberty," and "there was a 'risk of an erroneous deprivation of [Vasquez's liberty] interest' " because "the outcome of a jury trial was not certain." (*Vasquez, supra*, 27 Cal.App.5th at p. 81.) As to the state's interest in the delayed proceedings, the court stated that " '[t]he burden in going to trial in year two as opposed to going to trial in year 17 involves no additional administrative or fiscal burdens.' " (*Id.* at p. 82.)

Lastly, the court rejected the People's argument that, if there was a denial of due process, the remedy is to direct the case to trial forthwith. (*Vasquez, supra*, 27 Cal.App.5th at p. 82.) "[I]n light of the violation of Vasquez's Fourteenth Amendment due process right to a timely trial," the court concluded, "the proper remedy was dismissal of the petition." (*Id.* at p. 83.)

We now turn to the instant case.

### C.    Barker *Analysis*

#### 1.    *Length of the delay*

"The first *Barker* factor, the length of the delay, encompasses a 'double enquiry.' [Citation.] 'Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay, [citation] . . . . If the accused makes this showing, the court must then consider . . . the extent to which the delay stretches beyond the bare minimum

27

needed to trigger judicial examination of the claim.'" (*Williams*, *supra*, 58 Cal.4th at p. 234.)

The People citing *Vasquez*, *supra*, 27 Cal.App.5th at p. 61, concede that the 13-year delay in this case was sufficient to trigger the *Barker* analysis, and we conclude that this extraordinary delay weighs against the People.

### 2. *DeCasa's assertion of the right*

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right," and a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." (*Barker*, *supra*, 407 U.S. at pp. 531–532.)

" 'The issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.' " (*Williams*, *supra*, 58 Cal.4th at p. 238.)

Here, the People point out that, unlike the alleged SVP in *Vasquez*, DeCasas never exclaimed, "enough is enough," or otherwise verbally informed the court of his dissatisfaction with the speed of his case. The absence of such an utterance, however, is not determinative. In *Vasquez*, the court explained that Vasquez's failure to assert his speedy trial right prior to his statement that "enough is enough," could not "be weighed against him" because, in part, "Vasquez's ability to assert his speedy trial

28

right was hindered by the fact that from February 2002 to February 2012 he never appeared in court" and "could not realistically have asserted his due process rights during [that] 10-year period." (*Vasquez, supra*, 27 Cal.App.5th at p. 62.) Similarly here, after his appearance shortly after the petition was filed in 2006, DeCasas did not appear in court or by video until September 2011, and not again until the probable cause hearing in August 2013. He thereafter appeared only sporadically and, when he did appear, neither the court nor his counsel inquired of him whether he was insisting upon a speedy trial or agreed to waive that right.

The *Vasquez* court also explained that Vasquez's failure to expressly assert his right to a speedy trial earlier in his case was attributable to his knowledge that continuances were required "to enable his attorney to be prepared for trial." (*Vasquez, supra*, 27 Cal.App.5th at p. 62.) Vasquez was thus faced with a Hobson's choice " 'between proceeding to trial with an unprepared attorney, or giving up his right to a speedy trial.' " (*Id.* at p. 63.) The court thus agreed with the trial court's conclusion that " '[u]nder these circumstances, it is unfair to give significant weight to . . . Vasquez's failure to assert his right to a speedy trial.' " (*Ibid.*) Here, there is evidence of a similar Hobson's choice. In May 2012, Santiago moved to continue the probable cause hearing—then set for June 2012—on the ground that proceeding with the hearing at that time could impair his ability to prepare for trial. When the court asked Santiago whether DeCasas was willing to waive his rights to having his probable cause hearing as scheduled, Santiago responded that DeCasas had recently told a paralegal that he "is not happy with delays, but he does understand the reason why." This supports the trial

29

court's conclusion in this case that DeCasas "was forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial without prepared counsel or giving up his right to a speedy trial."

Under the circumstances in this case, we agree with the trial court's determination that it could not "give significant weight to [DeCasas's] failure to assert his right to a speedy trial."

### 3. *The reasons for the delay*

As the People assert, "the 'all-important question' is who is to blame for this presumptively prejudicial delay." Under the *Barker* analysis, it is, as our state and federal Supreme Courts have stated, "the 'flag all litigants seek to capture.' " (*Williams*, *supra*, 58 Cal.4th at p. 239, quoting *United States v. Loud Hawk* (1986) 474 U.S. 302, 315.)

In examining the reason for the delay, the court asks " 'whether the government or the criminal defendant is more to blame for th[e] delay.' " (*Vermont v. Brillon* (2009) 556 U.S. 81, 90 (*Brillon*).) "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." (*Barker*, *supra*, 407 U.S. at p. 531.) "In contrast, delay caused by the defense weighs against the defendant." (*Brillon*, *supra*, 556 U.S. at p. 90.)

In *Brillon*, the United States Supreme Court held that delays caused by appointed counsel should ordinarily be attributed to the defendant. "Because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' " the court explained, "delay caused by the defendant's counsel is . . . charged against the defendant." (*Brillon*, *supra*, 556 U.S. at pp. 90–91.) This is true regardless of "whether counsel is privately retained or publicly assigned."

30

(*Id*. at p. 91.)  Thus, although appointed counsel are paid by the state, they "generally are not state actors for purposes of a speedy-trial claim."  (*Id*. at p. 92.)  This rule, however, "is not absolute.  Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the [s]tate."  (*Id*. at p. 94.)

Here, the parties do not challenge the trial court's finding that the delays in DeCasas's case between 2006 and 2014, most of which resulted from continuances that DeCasas's counsel requested or stipulated to, are generally attributable to DeCasas. The focus of the People's argument is its challenge to the court's finding that the SVP unit staff reductions in 2014 constitute a systemic breakdown such that the resulting delays should be attributable to the state.

As our state Supreme Court observed in *Williams*, the *Brillon* court "did not define what constitutes a 'systemic "breakdown in the public defender system." ' " (*Williams*, *supra*, 58 Cal.4th at p. 248.)  In conjunction with that phrase, the *Brillon* court referred to " 'institutional problems' [citation], presumably in contrast to problems with individual attorneys" (*ibid*.), but this does little to shed light on the meaning of a systemic breakdown.

According to the People, a systemic breakdown, "could include a failure of the state to provide adequate funding and staffing for a defendant's defense. . . . But where the state fulfills its obligations, but an attorney (or his or her office) does not properly use those resources, the fault does not lie with the state."  The People cite no authority for this point and courts have not viewed the scope of a systemic breakdown so narrowly.

In *Williams*, our state Supreme Court held that although "several of defendant's [eight] attorneys appeared to make little or no progress in preparing his case for trial," there was no evidence of institutional problems that would indicate a systemic breakdown. (*Williams*, *supra*, 58 Cal.4th at p. 248.) The court, however, suggested the kind of evidence that might indicate such problems, including "a flaw in the public defender's mechanism for identifying and avoiding conflicts," "problems in the criminal defense panel's assignment system," "*unreasonable resource constraints, misallocated resources*, [or] inadequate monitoring or supervision." (*Id.* at p. 249, italics added.) In *Litmon*, the Court of Appeal identified the following as examples of a systemic breakdown: "understaffed public prosecutor or *public defender offices facing heavy caseloads*, underdeveloped expert witness pools, or insufficient judges or facilities to handle overcrowded trial dockets." (*Litmon*, *supra*, 162 Cal.App.4th at p. 403, italics added.) As the italicized language illustrates, a systemic breakdown is not limited to situations where the state has failed to provide adequate funding for defense counsel.

More on point, of course, is *Vasquez*, which addressed the same reduction of the SVP unit staff and corresponding increase in attorney caseloads that is involved in this case. In *Vasquez*, the trial court concluded that " '[t]he dysfunctional manner in which the [p]ublic [d]efender's [o]ffice handled . . . Vasquez's case was precisely the type of systemic or institutional breakdown contemplated by *Brillon* and *Williams*. Accordingly, the reason for the delay in bringing the case to trial should be attributed to the state, and not to . . . Vasquez.' " (*Vasquez*, *supra*, 27 Cal.App.5th at p. 73.) In particular, the court pointed to evidence that Vasquez's appointed counsel "was hampered in

32

her preparation for trial by the dramatic staffing cuts in the office, which limited the time she could spend on Vasquez's case. As a result, over the two-year period starting at the end of 2014, there was at best sluggish progress in moving Vasquez's then 14-year-old case to trial." (*Id.* at p. 72, fn. omitted.) Although the court acknowledged that, generally, "the public defender's office must have the flexibility to decide when it is necessary internally to change the assignment of an attorney" (*id.* at p. 73), under the circumstances in Vasquez's case, that "flexibility must yield to the individual's right to a timely trial." (*Id.* at p. 74.)

We agree with the *Vasquez* court's analysis and conclusion, and the instant case cannot be meaningfully distinguished. Although the People argue that the record in *Vasquez* included more instances of Shenkman, the deputy public defender in that case, complaining to the court about the staff reductions and her increased caseload than Santiago did in this case, the number of attorney complaints is not dispositive. As the court noted below, Santiago testified that "it was a well-known fact in the courthouse that staffing cuts were ongoing and that attorneys were delaying their cases trying to keep up." In addition to transcripts of court proceedings in DeCasas's case, "Santiago was present at various conversations with [superior court judges] and the [p]ublic [d]efender's [o]fficer where the office informed the court of the problems with the caseloads and staffing." Santiago, therefore, did not need to remind the court of these problems at each appearance. Moreover, the record in this case includes the memos and letters written by Osaki and other SVP unit attorneys, including Santiago, describing the deleterious effects of the staffing cuts on their ability to effectively represent their clients. There is thus substantial evidence to support the court's

finding that a systemic breakdown in the public defender's office caused delays in SVPA cases, including DeCasas's, beginning in 2014. The trial court did not err, therefore, in determining that such delays are thus attributable to the state.

We also agree with the trial court that the court itself enabled and compounded the delays resulting from the staffing cuts by failing to fulfill its duties " 'to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay.' " (*Vasquez*, *supra*, 27 Cal.App.5th at p. 77.) As the trial court observed, "there is no record of the court engaging in a consideration of whether good cause existed for each of the requests to continue between 2006 and 2018, only of it ever ordering the parties to appear on the next agreed-upon date."

The trial judge, our Supreme Court has explained, " 'is the captain of the ship,' " and "must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial." (*Williams*, *supra*, 58 Cal.4th at p. 251.) Protecting such interests may require the court to remove overburdened appointed counsel on its own motion even if the public defender does not seek to withdraw. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 78.) Here, however, the trial court, despite "the knowledge that the entire [SVP unit] was struggling with enormous caseloads, . . . did not inquire whether [DeCasas's] counsel had the ability to adequately prepare for trial or whether [DeCasas] would rather continue with [his assigned counsel] and move at a slower pace or appoint new counsel and move quickly to trial, nor did it consider removing the [p]ublic [d]efender's [o]ffice until 2018, nearly four years after first learning of the dramatic staffing cuts and the unit's ensuing struggle."

34

The court's "affirmative constitutional obligation" (*Williams*, *supra*, 58 Cal.4th at p. 251) to protect the interests in a speedy trial also counteracts what the People refer to as the public defender's "perverse incentive to request unreasonable continuances (or encourage its attorneys to do so) in the hopes of inducing a windfall dismissal." By requiring good cause for continuances, removing overburdened deputy public defenders, and exercising the court's inherent authority to order supervisors in the public defender's office "to appear in court to address" the public defender's staffing decisions (see *Vasquez*, *supra*, 27 Cal.App.5th at p. 81), the court can determine whether delays are due to a systemic breakdown within the public defender's office or a strategic misallocation of the public defender's resources. For purposes of the *Barker* analysis, to the extent the court's failure to fulfill its obligation as a protector of the right to a speedy trial caused the delay, that delay is attributable to the state. (*Id.* at p. 74; *Landau*, *supra*, 214 Cal.App.4th at p. 41.)

Lastly, there is substantial evidence to support the court's finding that the prosecution is to blame for its unexplained nearly one-year delay, from early 2015 to March 2016, in requesting and obtaining updated reports from the People's evaluators. The prosecutor promised to obtain those reports in April 2015, apologized without explanation for failing to have them in August 2015, and did not provide them to Santiago until March 2016.

Based on the foregoing there is substantial evidence to support the court's finding that the delays in bringing DeCasas's case to trial beginning in 2014 are attributable to the state.

#### 4. *Prejudice*

Courts must assess the prejudicial effect of pretrial delay in light of the interests the speedy trial right was designed to protect. (*Williams*, *supra*, 58 Cal.4th at p. 235.) The *Barker* court identified three such interests: (1) "to prevent oppressive pretrial incarceration"; (2) "to minimize anxiety and concern of the accused"; and (3) "to limit the possibility that the defense will be impaired." (*Barker*, *supra*, 407 U.S. at p. 532.)

Here, the People concede that "13 years without a trial is certainly oppressive." They contend, however, that the evaluation of prejudice should take into consideration the fact that "DeCasas was a severely mentally ill patient housed in a hospital, not a prisoner languishing in jail." There are at least two problems with this point. First, the "fact" that "DeCasas was a severely mentally ill patient" has not been established because there has not been a trial and, indeed, is disputed by two defense experts who have opined that DeCasas does not satisfy the criteria for diagnoses of pedophilia or schizophrenia, and does not have a diagnosed mental disorder within the meaning of the SVPA.

Second, although the People describe DeCasas's 13-year confinement in a state mental hospital somewhat euphemistically as being "housed" (in contrast to "languishing") "in a hospital," a "commitment to a mental hospital produces 'a massive curtailment of liberty,' " which " 'can engender adverse social consequences to the individual' . . . that . . . can have a very significant impact on the individual." (*Vitek v. Jones* (1980) 445 U.S. 480, 491–492; accord, *Litmon*, *supra*, 162 Cal.App.4th at p. 400.) Thus, even if the delay did not impair the defense,

the prejudice factor weighs in favor of finding a violation of a speedy trial right.

### 5. Barker *Analysis Conclusion*

Under *Barker*, none of the four factors—the length of the delay, the assertion of the right, the reasons for the delay, or prejudice—"is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.' " (*Williams*, *supra*, 58 Cal.4th at p. 233.) Here, the trial court, in its 45-page ruling, engaged in that balancing process and concluded that "the [s]tate had failed [DeCasas]." Whether we review this determination under the abuse of discretion standard or, as the People assert, under a de novo standard, we find no error based on the analysis set forth above.

### D. *Mathews* Test

As the *Vasquez* and *Litmon* courts did, the trial court also engaged in an analysis under *Mathews* and concluded that DeCasas's "right to be free from government restraint without due process of law has been violated." We agree.

*Vasquez* is again instructive and not meaningfully distinguishable. In that case, the court explained that "Vasquez's confinement for 17 years awaiting trial caused a significant deprivation of liberty" and, "given Vasquez's lengthy commitment, there was a 'risk of an erroneous deprivation of [Vasquez's liberty] interest.' " (*Vasquez*, *supra*, 27 Cal.App.5th at p. 81.) Here, DeCasas's confinement of 13 years, though less

37

than Vasquez's 17 years, constitutes a substantial interference with his "fundamental right . . . 'to be free from involuntary confinement by his own government without due process of law.' " (*Litmon*, *supra*, 162 Cal.App.4th at p. 399.)

"The second *Mathews* factor, 'the risk of an erroneous deprivation of such interest through the procedures used' [citation], is considerable," as DeCasas "has already experienced an extended confinement without any determination that he was an SVP." (*Litmon*, *supra*, 162 Cal.App.4th at p. 400.) Moreover, because DeCasas had two psychologists who opined that he did not fulfill a requirement of being an SVP and the People had the burden of proving that fact beyond a reasonable doubt, the outcome of a jury trial was far from certain. (See *Vasquez*, *supra*, 27 Cal.App.5th at p. 81.)

As for the third *Mathews* factor—the government's interest—the " 'state has no interest in the involuntary civil confinement of persons who have no mental disorder or who are not dangerous to themselves or others.' " (*Vasquez*, *supra*, 27 Cal.App.5th at p. 82.) Furthermore, " '[t]he burden in going to trial' " early in the case as opposed to going to trial in year 13 " 'involves no additional administrative or fiscal burdens.' " (*Ibid.*)

### E. *The Remedy*

The People make a cursory contention that, if we uphold the court's determination that DeCasas's right to due process right to a speedy trial was violated, "the case should be ordered to trial forthwith," not dismissed. The statement is made without citation to authority and is contrary to binding precedent. As the *Barker* court stated, "[t]he amorphous quality of the [speedy trial] right also leads to the unsatisfactorily severe remedy of dismissal

38

of the indictment when the right has been deprived.  This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried.  Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy." (*Barker*, *supra*, 407 U.S. at p. 522, fn. omitted; accord, *Williams*, *supra*, 58 Cal.4th at p. 233; *Vasquez*, *supra*, 27 Cal.App.5th at p. 83.)  The court, therefore, did not err in dismissing the petition.

## DISPOSITION

The August 19, 2019 order dismissing the SVPA petition against respondent DeCasas is affirmed.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.

39

Filed 9/17/20

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RODRIGO DECASAS,<br><br>    Defendant and Respondent. | B301297<br><br>(Los Angeles County<br>Super. Ct. No. ZM010896) |


THE COURT:

    The opinion in the above-entitled matter filed on August 31, 2020 was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.


_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.